J-A03018-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ESTATE OF: JOSEPH L. GRAHEK, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: DAVID J. GRAHEK, PHILIP L. GRAHEK, KATHLEEN G. CONNAL, JAMES V.A. GRAHEK, STEVEN P. GRAHEK | |
| | No. 554 MDA 2016 |

Appeal from the Order Entered March 11, 2016
In the Court of Common Pleas of Lancaster County
Orphans' Court at No: 36-1976-1376

BEFORE:  LAZARUS, STABILE, and DUBOW, JJ.

MEMORANDUM BY STABILE, J.:                **FILED APRIL 27, 2017**

Appellants, David J. Grahek, Philip L. Grahek, Kathleen G. Connal, James V.A. Grahek, and Steven P. Grahek, appeal from the March 11, 2016 order adjudicating the account[1] of Wells Fargo Bank, N.A. (the "Trustee"). We affirm.

This matter concerns a trust (the "Trust")[2] created under the October 1, 1971 will of Joseph L. Grahek, deceased.  The Trust's asset was income-

---

[1] **See** Pa. O.C. Rule 2.9.

[2] There are two trusts at issue in this litigation.  The parties reference them as Trust A and Trust B.  For purposes of this memorandum, we shall refer to both as the Trust.
*(Footnote Continued Next Page)*

producing property (the "Property") located in Orange County, California.[3] Marion Grahek ("Mrs. Grahek"), the decedent's wife was the Trust's income beneficiary during her lifetime. Appellants David J. Grahek and Philip L. Grahek were remainder beneficiaries.[4] The Trust produced $200,000 to $300,000 per year in income for Mrs. Grahek.

On August 28, 2006, the Trust sold the Property because it was under threat of eminent domain from the Orange County School District. The Trustee planned to reinvest the sale proceeds—$8.7 million[5]—in like-kind property in order to avoid the capital gains tax. Section 1033 of the Internal Revenue Code permits conversion of property without recognition of a capital gain if the property in question is under threat of eminent domain. 26 U.S.C.A. § 1033. In this case, a qualifying 1033 exchange needed to occur before the end of 2009.

*(Footnote Continued)* ───────────────

[3] We culled our summary of facts from the orphans' court's March 11, 2016 memorandum.

[4] Mrs. Grahek died on October 16, 2013. Appellants Kathleen G. Connal, James V. A. Grahek and Steven P. Grahek did not participate in this litigation and were never listed in the caption until the notice of appeal. Opinion Sur Appeal, 6/2/2016, at 1 n.2. The orphans' court questioned the standing of these parties. *Id.* Neither side briefed the issue, and we have no need to address it.

[5] The net gain on the sale was $8.2 million.

The Trustee invested roughly $2.1 million of the sale proceeds in money market accounts. That amount would eventually cover the down payment on a replacement property or the capital gains tax. The Trustee intended to obtain nonrecourse financing for the remainder of the purchase price of a replacement property. The Trustee planned to find a replacement property that would produce sufficient income to cover the mortgage. The Trustee invested the remainder of the Property sale proceeds, roughly $6.5 million, in a stock portfolio. The Trustee believed its strategy would continue to produce income for Mrs. Grahek and increase the principal value for the remainder beneficiaries. Appellants agreed with the Trustee's plan.

During the financial crisis of 2008, nonrecourse financing became temporarily unavailable and the Trust's investment portfolio lost some of its value. Dissatisfied with the situation, Appellants David J. Grahek and Philip L. Grahek petitioned to remove Wells Fargo as trustee. By agreement, David and Philip Grahek accepted appointments as trustees *pro tem*. In 2009, under their direction, the Trust purchased properties in Chattanooga Tennessee and Canton, Georgia. The Trust did not have to pay a capital gains tax.

On October 29, 2010, Appellants filed a petition to compel the filing of an account.[6] The Trustee filed its first account on January 14, 2011.

---

[6] *See* 20 Pa.C.S.A. § 7797.

J-A03018-17

Appellants filed objections to the account on March 1, 2011. The Trustee filed a motion for judgment on the pleadings on June 1, 2011. The orphans' court denied that motion on January 23, 2012. The parties filed a joint stipulation of facts on March 26, 2015. Appellants filed amended objections two days later. The orphans' court conducted four days of hearings, the last of which occurred on April 10, 2015. The orphans' court entered the order on appeal on March 11, 2016. Appellants filed this timely appeal on April 8, 2016.

Appellants state the questions involved as follows:

1. Did the orphans' court err as a matter of law in concluding that the five-year investment horizon pursued by [the Trustee] satisfied the requirements of the prudent investor rule when [the Trustee] acknowledged that the maximum investment horizon was only three years and four months, and [the Trustee] was notified six months before the market crashed that 100% of the assets would be needed to complete the 1033 exchange?

2. Did the orphans' court err as a matter of law in approving [the Trustee's] compensation in light of its breach of fiduciary duty?

Appellants' Brief at 4.[7]

_____

[7] The orphans' court, in its June 2, 2016 opinion sur appeal, notes that Appellants' questions presented differ in certain details from the issues they raised in their objections to the account. Likewise, Appellee asserts that Appellants have waived their arguments on appeal because they never raised them at trial (a violation of Pa.R.A.P. 302(a)), or because they are not included in Appellants' concise statement of errors (resulting in waiver under Pa.R.A.P. (b)(4)(vii)). As set forth in the main text, we conclude that the trial court's March 11, 2016 opinion provides a sufficient basis for this
*(Footnote Continued Next Page)*

- 4 -

The following standard governs our review:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*In re Estate of Fuller*, 87 A.3d 330, 333 (Pa. Super. 2014). Further, we are cognizant that "one who seeks to surcharge a trustee bears the burden of proving that the trustee breached an applicable fiduciary duty." *In re Dentler Family Trust*, 873 A.2d 738, 745 (Pa. Super. 2005), *appeal denied*, 897 A.2d 1184 (Pa. 2006).

Instantly, the orphans' court found no breach of fiduciary duty. Rather, the orphans' court found that the Trustee met its legal obligations; that the Trustee's plan sufficiently provided for the interests of the income and remainder beneficiaries; and that a financial crisis of historic proportions was unforeseeable. Having reviewed the record, the parties' briefs, the applicable law, and the orphans' court's opinion, we adopt the orphans' court's March 11, 2016 opinion as our own. The orphans' court's thoroughly

*(Footnote Continued)* ───────────

Court's review and an accurate analysis of the substance of Appellants' objections to the account and arguments on appeal. To the extent Appellants intended to raise any issues not addressed in the trial court's March 11, 2016 opinion and/or not previously preserved in accordance with the Rules of Appellate Procedure, we deem such issues waived.

and accurately explains the lack of merit in each of Appellants' objections to the Trustee's account. We direct that a copy of the orphans' court's opinion be filed along with this memorandum.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2017

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN THE ESTATE OF: :

                :

     JOSEPH L. GRAHEK         :      No. 36-1976-1376

     deceased                    :

## OPINION ON OBJECTIONS TO ACCOUNT FOR MARITAL TRUST FOR THE BENEFIT OF MARION S. GRAHEK-ATKINSON AND TRUST FOR THE BENEFIT OF MARION S. GRAHEK-ATKINSON

PROCEDURAL HISTORY

Currently pending before the Court are the Amended Objections of Marion S. Grahek-Atkinson, David J. Grahek and Philip L. Grahek filed on March 27, 2015 (hereinafter "Objections to Trust A") to First Account of Wells Fargo, N.A. pertaining to the Trust under Will of Joseph L. Grahek dated October 1, 1971, Marital Trust for the Benefit of Marion S. Grahek-Atkinson (hereinafter "Trust A") and to the Petition for Adjudication Related thereto. Also pending are Amended Objections of Marion S. Grahek-Atkinson, David J. Grahek and Philip L. Grahek filed on March 27, 2015 (hereinafter "Objections to Trust B") to First Account of Wells Fargo, N.A. pertaining to the Trust under Will of Joseph L. Grahek, Deceased, dated October 1, 1971, Trust for the Benefit of Marion S. Grahek-Atkinson (hereinafter "Trust B") and to the Petition for Adjudication Related thereto.

Wells Fargo Bank (hereinafter "Trustee") served as Trustee of two trusts established by Joseph L. Grahek[1]. Initially, the asset of these trusts was a property located at 155 East La Jolla Street, Orange County, California (hereinafter "Placentia Property"). The Placentia Property was sold on or before August 28, 2006, after notice was provided that the property was under threat

---

[1] These trusts are referred to as Trust A and Trust B throughout the Pleadings and supporting documents as well as during the hearings on the Objections.

1

of condemnation. As a direct result of circumstances surrounding the sale of the property, Trustee allegedly attempted to execute an "exchange" of the property through the purchase of a subsequent property in accordance with Section 1033 of the Internal Revenue Code (hereinafter "1033 Exchange").

On February 13, 2009, Kathleen G. Connal, David J. Grahek, James V.A. Grahek, Philip L. Grahek and Steven P. Grahek (hereinafter collectively "Remainder Beneficiaries") and Marion S. Grahek Atkinson (hereinafter "Life Tenant") filed a Petition for Removal and Replacement of Trustee or Appointment of a Substituted Fiduciary *Pro Tem* (hereinafter "*Pro Tem* Petition"). Remainder Beneficiaries and Life Tenant contended that Trustee was failing to find appropriate properties to complete the 1033 Exchange. While the litigation surrounding the *Pro Tem* Petition progressed, the deadline for completing the 1033 Exchange grew closer. All parties appeared concerned that a resolution to their differences would not be reached in time to effectuate the 1033 Exchange.

In an attempt to complete the 1033 Exchange, the parties entered into a Stipulation and Release Agreement whereby Trustee agreed to the appointment of two of the Remainder Beneficiaries, David J. Grahek and Philip L. Grahek as trustees *pro tem*. See Grahek Stipulation and Release Agreement filed March 25, 2009 and attached to the Court Order of March 27, 2009. The Agreement also states that:

> In consideration of the Agreement, Beneficiaries, for themselves and their respective heirs, guardians, executors, administrators, predecessors, successors, parents, subsidiaries or affiliated corporations; companies divisions or entities; partners, directors, officers, managers, supervisors or employees; insurers; stockholders; personal representatives, attorneys, agents or assigns, and any one claiming through or under them or any of them (all the foregoing persons and entities referred to collectively as the "Releasors"), fully remise, release and fully

2

discharge Wachovia, its respective heirs, guardians, executors, administrators, predecessors, successors, parents, subsidiaries or affiliated corporations, companies, divisions or entities, partners, directors, officers, managers, supervisors or employees, insurers, stockholders; personal representatives, attorneys, agents or assigns, and any one claiming through or under it or any of them (collectively "Wachovia") from all debts, obligations, demands, judgments, claims, controversies or causes of action of any kind whatsoever either in law or on equity, whether foreseen or unforseen, matured or unmatured, known or unknown, accrued or not accrued, expenses, interest, attorneys' fees, which Releasors, or any of them, ever had, now have, or hereinafter can, shall or may have against Wachovia arising out of or in any way related to the 1033 Exchange involving the Placentia Property except to the extent of loss or liability solely as a result of any of Wachovia's warranties set forth in Paragraph 7 being untrue, inaccurate or erroneous in any material respect. Releasors expressly agree that except as set forth in the proceeding sentence, Wachoiva shall have no liability whatsoever arising out of or in any way related to the 1033 Exchange involving the Placentia Property, including by not limited to taxes, penalties and interest (including capital gains tax) that may be due or become due to any taxing authority, including but not limited to the Internal Revenue Service or any state, local or municipal taxing authority. This paragraph does not release any claim Beneficiaries have asserted or may assert with respect to the administration of the Grahek Trusts, including but not limited to investment of the Trust assets up to the Effective Date.

Id. at ¶8. Along with agreeing that David J. Grahek and Philip L. Grahek could serve as trustees pro tem, the parties agreed that "[d]uring the Pro Tem Trustee Period, assets of the Grahek Trusts maintained by Wachovia [now Wells Fargo] shall be maintained only pursuant to the Administrative Agency Agreement, which is attached hereto as Exhibit "C". . . ." Id. at ¶6. On March 27, 2009, this Court entered an Order appointing David J. Grahek and Philip L. Grahek as trustees pro tem (hereinafter "Trustees Pro Tem"), in accordance with the Agreement entered into by all parties.

On October 29, 2010, Trustees Pro Tem and the Life Tenant (hereinafter collectively "Objectants") filed a Petition to Compel the Filing of an Account By Trustee. On January 14, 2011, Trustee filed their First Account for their period of administration of the two trusts. On

3

March 1, 2011, Objectants filed their initial objections.

On June 1, 2011, Trustee filed a Motion for Judgment on the Pleadings, or in the Alternative, for Partial Summary Judgment. This Motion, in part, brought to issue the scope of the release language of paragraph 8, reproduced above. On January 23, 2012 the Court issued an Opinion and accompanying Order denying the Motion for Judgment on the Pleadings. This opinion provided the parties with the Court's interpretation of the language of paragraph 8 and how it limited the liability of Trustee.

On March 26, 2015, a Joint Stipulation of Facts was filed by the parties. Amended Objections were filed on March 27, 2015 as referenced above. Hearings were held on March 30, 2015, April 1, 2015, April 9, 2015 and April 10, 2015. The parties have submitted briefs and reply briefs supporting their respective positions and the mater is now ripe for disposition.

FINDINGS OF FACT

Joseph L. Grahek (hereinafter "Decedent") died on October 14, 1976 having disposed of his Estate by Will. See Joint Stipulation of Facts.

The Decedent's Will created two irrevocable trusts, a marital trust (Trust A) and a residual trust (Trust B). Id.

The sole income beneficiary of Trust A and Trust B was Marion Grahek, also known as Marion Grahek-Atkinson. Id.

The Remainder Beneficiaries of Trust A are the beneficiaries identified by Mrs. Grahek-Atkinson's estate plan or, if no plan exists, to the corpus of Trust B. The Remainder Beneficiaries of Trust B are the children of Decedent and Marion Grahek-Atkinson and include Objectors, David J. Grahek and Philip L. Grahek. Id.

4

Trust A also contained a provision that Trustee pay principal to Mrs. Grahek-Atkinson "for her support, comfort and well being, whenever the Trustee determines that the income of my wife from all sources, including this trust, is not sufficient for her support, comfort and well being." See Decedent's Will.

Trust B also contains a provision for the payment of corpus to Mrs. Grahek-Atkinson if Trustee deems such payment necessary. Id.

The Trusts initially named National Central Bank as Trustees, which became Wachovia Bank, N.A. and then Wells Fargo Bank, N.A. See Joint Stipulation of Facts.

The primary asset of Trust A and Trust B was a parcel of real estate in California which sustained a commercial building (hereinafter "Placentia Property"). Id.; N.T. p. 21, ll. 8-16.

Trust A held 24.19% of the real estate asset while Trust B held 75.81% of the real estate asset. Joint Stipulation of Facts; N.T. p. 160, ll. 13-14.

Wells Fargo Bank was aware that the Orange County School District was interested in acquiring the Placentia Property as early as 2003 or 2004 and might resort to eminent domain. Joint Stipulation of Facts; N.T. p. 13, ll. 12-22.

The Placentia Property was sold under threat of condemnation on August 28, 2006 for a sales price of $8.7 Million. Joint Stipulation of Facts; N.T. p. 22, ll. 5-8; p. 26, ll. 12-19.

The net gain on the Placentia Property was $8.2 Million. Joint Stipulation of Facts.

While the Trust held the Placentia Property, it produced approximately $200,000 to $300,000 a year for the life-time beneficiary, Marion Grahek-Atkinson. N.T. 430, ll. 12-18.

A 1033 Like-Kind Exchange is a reference to the Tax Code which is applicable where an initial property is taken through eminent domain or condemnation and a new property can be

acquired, without any capital gains tax consequences, so long as the acquisition takes place withing 3 years from the end of the year in which the condemnation activity occurred. Joint Stipulation of Facts; N.T. p. 462, ll. 13-18; p. 469, ll.18-22.

The Federal Tax Returns and the California State Tax Returns for 2006 both reflected an intention to complete a 1033 Like-Kind Exchange. Joint Stipulation of Facts; Joint Exhibits B and C; N.T. p. 27, l. 1 - p. 28, l. 23.

The deadline to complete the 1033 Like-Kind Exchange was December 31, 2009. Joint Stipulation of Facts.

At some point in 2005, Attorney Stephen J. Schumacher began preparing a legal opinion regarding a 1033 exchange. A draft of his initial research was provided to Attorney Gerald Williams by correspondence and it referenced a request date of April 26, 2005. N.T. p. 24, l.3- p. 25 l.15.

The draft of the research of Attorney Schumacher was marked "Draft for Information Purposes only." and was not completed. See Exhibit G-301 and N.T. p. 25, l.16- p. 26, l. 8.

In an e-mail dated October 3, 2006, David Grahek raised concerns about the ramifications of his mother's death on completing the 1033 Exchange. See G-26; N.T. p. 41, l. 1- p. 43, l. 6.

As a result of Mr. David Grahek's inquiry, Trustee sought to obtain a legal opinion regarding the issues raised in the October 3, 2006 correspondence. N.T. p. 43, ll. 7- 23.

Mr. David Grahek testified that he agreed to obtaining the legal opinion of Tom Bergen, an attorney in Lancaster County, to address his concerns about the 1033 exchange and the possible death of his mother. N.T. p. 43, ll. 7 - 23.

Wells Fargo Bank paid Attorney Bergan $4,825 to prepare his legal opinion. N.T. p. 250,

6

l.7 - p. 251 l. 1.

Attorney Bergan prepared a 6 page legal opinion dated December 15, 2006 wherein he specifically identifies that the "question concerns the ability of the trusts or the remainder beneficiaries to elect to defer some or all of the gain from the conversion. . . , after the demise of Mrs. Grahek-Atkinson." See Exhibit G-45.

Wells Fargo Bank proposed to invest 20% of the funds received from the sale of the Placentia Property in short-term investments and the rest would be placed in a "combination of income stocks, growth stocks; a fully diversified portfolio of large-cap, mid-cap, small-cap, international emerging market stocks and fixed-income based on the modern portfolio theory". N.T. p. 303, l. 21- p. 304, l.5; p. 305, ll. 17-23.

Wells Fargo segregated $2,210,000.00 and invested that in Money Market Accounts earning an average of 4 to 4.5% to cover the costs of the Capital Gains taxes due on the sale of the Placentia Property if the 1033 exchange could not occur. Joint Stipulation of Facts; N.T. p. 152, l. 25- p. 153, l.22.

The funds remaining after sequestration of the $2.1 Million for taxes totaled approximately $6.5Million and were invested in a balanced portfolio that utilized Modern Portfolio Theory. N.T. p. 338, ll. 2- 6; p. 339, l. 11- p. 340, l. 23.

The money invested by Wells Fargo in the diversified portfolio was held in investments that could be readily converted into cash. N.T. p. 234, ll. 5- 13.

From the beginning, Wells Fargo intended to seek non-recourse financing and to utilize the $2.1 Million invested for paying capital gains taxes as a down-payment on a replacement property. N.T. p. 154, ll. 4- 20.

7

The initial Wells Fargo strategy was to purchase a property utilizing approximately $2.1 Million and non-recourse financing for the remaining purchase price to avoid paying Capital Gains Taxes on the sale of the Placentia Property and allow the approximate $6 Million remaining from the sale to be free for investment. N.T. p. 158, l. 21- p. 159, l.7.

Mr. Mark Allen testified that the investments in the Grahek portfolio could have been liquidated within three (3) days in order to purchase a property under a 1033 exchange. N.T. p. 336, ll. 17 - 19.

Mr. Mark Allen, who served as the Trust Investment Officer and who no longer works for Trustee, testified that they had two groups they had to satisfy with their choice of investments; the income beneficiary and the growth of capital for the residual beneficiaries. N.T. p. 343, l. 20- p. 344, l.8; p 352, ll. 17-24.

Ms. Spencer, the expert for Objectors also acknowledged that "[t]his is a split-interest trust. There's an income beneficiary, Mrs. Grahek, who was to received the income, and the remainder beneficiaries who were to receive the principal when Mrs. Grahek passed away. So the trustee has duties to both sets of beneficiaries, and it's the trustee's responsibility to provide income for the income beneficiary and to preserve and increase the principal for the principal beneficiaries." N.T. p. 559, ll. 8-17.

The Bank's investment policy for the Trusts was to provide Mrs. Atkinson with approximately $300,000 in annual income. N.T. p. 344- ll.12-25.

The Trust investment officer , Mr. Mark Allen, testified that "one of my objectives, because we talk about preservation of principal, one of mine was preservation of buying power. That, to me, was extremely important, to stay above what was happening in real estate. If the

8

real estate market went down, and my portfolio went down, as long as I stayed above what they were looking to reinvest in, we were still accomplishing what we were trying to do. I was more - - as much afraid of real estate moving up dramatically and their buying power dropping precipitously." N.T. p. 346, ll. 12- 23.

Trustee avoided investing in any subscription-based investments with a lock-up period so that the invested funds could be accessed quickly if an appropriate 1033 property could be located. N.T. p. 355, ll.8-20.

On June 18, 2007, Paul Bernett, a regional managing director for real estate asset management with Trustee who was assigned to the Grahek Trusts advised another member of the real estate department that the Managing Directors for the Bank would not approve a leverage ratio of greater than 50% of any real estate purchased. N.T. p. 379, l. 23 - p. 381, l. 7.

On February 15, 2008, after being advised by Mr. George George that non-recourse financing was no longer available, Mr. Bernett with the Real Estate Department of the Bank suggested purchasing a replacement property at 100% of the cost. N.T. p. 385, l. 17- p. 386, l.3; p.387, ll. 16-20.

In 2008, approximately two years into the search for a replacement property, Wells Fargo Bank also sought the legal advice of Attorney N. Brooke Gabrielson who was asked to address the impact the creation of an LLC would have on a 1033 exchange in avoiding Capital Gains Taxes. N.T. p. 251, l. 20 - p. 253, l.11; p. 399, l. 16.

Attorney Gabrielson of Howse & Brown submitted a 6 page legal opinion dated September 15, 2008 which addresses the issues raised by Mr. Paul Bernett in his e-mail correspondence to Attorney Gabrielson of August 29, 2008. See Exhibit WF-195; Exhibit WF-

9

260.

The Howser & Brown Opinion asked, in part, if all the equity had to be reinvested for purposes of a 1033 exchange. N.T. p. 397, l. 16- p. 398, l.17.

From October 1, 2006 until June 30, 2009, Trust A earned $248,501 and Trust B earned $876,974. N.T. p. 361, ll. 14- 17; p. 362, l. 23- p. 363, l.10.

Mr. Mark Allen, who served as a Vice President and Investment Strategist with Trustee, was asked about two of the sales of stock; namely the purchase of $270,000 worth of Lazard Emerging Markets Portfolio on April 30, 2008 and Wells Fargo Advantage Endeavor Select on December 11, 2008. N.T. p. 333, l. 19- p.334, l. 16.

Mr. Maloney testified that Wells Fargo "made every effort, based on the paperwork that I reviewed, to seek out a property that consisted or had the qualifications they required, acting in a fiduciary capacity, to acquire a property in a 1033 exchange." N.T. p.584, l. 22- p. 585, l. 1.

On June 9, 2009, Trust B purchased a replacement property in Chattanooga, Tennessee using $4.6 Million in cash and liquidated securities and $4,134,000 in non-recourse financing for a total purchase price of $8.7 Million. Joint Stipulation of Facts.

On September 23, 2009, Trust A and Trust B purchased a replacement property in Canton, Georgia using $2.6 Million in cash and liquidated securities and $1.1 million in non-recourse financing for a total purchase price of 3.7 Million with Trust A owning 75% of the property and Trust B owning 25% of the property. Joint Stipulation of Facts.

On October 16, 2013, Marion Grahek-Atkinson died. Joint Stipulation of Facts.

CONCLUSIONS OF LAW

Trustee had a fiduciary duty to both the lifetime income beneficiary, Mrs. Grahek-

Atkinson, as well as the remainder beneficiaries. The standard of care imposed upon the Trustee is that identified under the Prudent Investor Rule, 20 Pa.C.S. §7201, et. seq. Essentially, "[a] fiduciary shall invest and manage property held in a trust as a prudent investor would, by considering the purposes, terms and other circumstances of the trust, and by pursing an overall investment strategy reasonably suited to the trust." 20 Pa.C.S. §7203(a). When making investment decisions, a fiduciary "shall consider, among other things, to the extent relevant to the decision or action:

(1) the size of the trust;
(2) the nature and estimated duration of the fiduciary relationship;
(3) the liquidity and distribution requirements of the trust;
(4) the expected tax consequences of investment decisions or strategies and of distributions of income and principal;
(5) the role that each investment or course of action plays in the overall investment strategy;
(6) an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries. . . .
(7) to the extent reasonably known to the fiduciary, the needs of the beneficiaries for present and future distributions authorized or required by the governing instruments; and
(8) to the extent reasonably known to the fiduciary, the income and resources of the beneficiaries and related trusts.

20 Pa.C.S. §7203 (c).

The initial burden of proof rests with the Objectors.

In general, one who seeks to surcharge a trustee bears the burden of proving that the trustee breached an applicable fiduciary duty. However, when a beneficiary has succeeded in proving that the trustee has committed a breach of duty and that a related loss has occurred, .. the burden of persuasion ought to shift to the trustee to prove, as a matter of defense, that the loss would have occurred in the absence of a breach of duty. We believe that, as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty.

In re Dentler Family Trust, 2005 PA Super 146, 873 A.2d 738, 745 (2005) *citing* Estate of

11

Stetson, 463 Pa. 64, 345 A.2d. 679, 690 (1975). "[I]f the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." In re Paxson Trust I, 2006 PA Super 9, 893 A.2d 99, 122 (2006) citing Restatement (Second) of Trusts § 205.

ANALYSIS

**Objection 4**

The pivotal objection to the Trustee's actions and investment strategy is Objection 4 which states:

> 4. Objection is made to each of the following enumerated investments listed on Exhibit "A", attached hereto and made a part hereof as wholly inappropriate in the circumstances of the trust, as the trust had short term liquidity needs, the trustee elected to pursue a 1033 like-kind exchange and the trustee failed to implement an investment process with appropriate investment objectives and time horizons for acquisition of replacement property.

At the time of trial, this objection had evolved into an objection that encompassed an objection to the overall investment strategy implemented by Trustee[2].

Objectors assert that the Trustee was under an obligation, as a fiduciary, to retain all funds from the sale of the Placentia Property in cash or cash equivalents to ensure that there was sufficient cash on hand to purchase a replacement property under section 1033 of the Internal

---

[2]As exhibited above, the Objection filed by Objectors specifically identified a list of investments at issue. However, throughout trial and even in their brief, Objectors focused on the generalized theory that "[t]he Bank improperly exposed Trust assets to market risk when those assets needed to be preserved in order to ensure their availability for the completion of a like-kind exchange under section 1033 of the Internal Revenue Code of 1986." Objectors Brief, p. 29. Little evidence was provided of the specific enumerated investments in Exhibit "A" as the presentation of evidence focused more on the choice of Trustee to place funds in a balanced portfolio rather than retaining the funds in cash.

12

Revenue Code. Objectors assert that this initial failure to maintain proceeds in cash, along with the subsequent failures of the employees of Trustee to alter the investment strategy at various stages in the process of finding a suitable property, resulted in a breach of the Trustee's fiduciary duty. Objectors assert that this purported breach makes Trustee chargeable for the market losses suffered by the Trust during the 2008 stock market plunge.

The Objectors seek to have the Court draw from the plain language of the Trusts to identify the intent of the Settlor. Objectors assert that this intent should have been the polestar by which Trustee set its investment goals. It is apparent that the Settlor established Trust A and Trust B to minimize the tax obligations upon his death. Trustee's actions of pursuing a 1033 exchange demonstrated a commitment to that goal. A 1033 exchange would certainly accomplish Settlor's purpose and minimize tax consequences. Furthermore, a 1033 exchange would have also continued to hold assets in real estate. From the plain language of the Trusts, it is also apparent that Settlor intended to ensure his wife, Mrs. Grahek-Atkinson was cared for during her life and that the assets of the Trust be safeguarded for the residual beneficiaries.[3]

Objectors approach the management of the Trusts from the fundamental starting point that "it was clear that the most important consideration in the management of the Placentia sale proceeds was to keep the assets liquid, that is, to maintain the ability to convert them to cash without loss of principal as there was at the time no dire need to generate income or growth." Objectors brief, pg. 42. The Court is not persuaded that the starting point was the need to keep

---

[3]The Court also notes that Settlor intended for the Trusts to be administered by a corporate entity. It would seem that allowing the two sons of the Settlor to serve as Trustees Pro Tem is more afield from the intent of Settlor than any of the investment strategies employed by Trustee.

13

the assets liquid. Objectors, time and time again, dismiss the duty of the Trustee to the income beneficiary, their own mother.

This case is plagued by two significant issues that the Court finds persuasive. Namely, the Trusts in question served two masters and the Objectors have the favor of hindsight. The Trusts were charged with providing Mrs. Grahek-Atkinson with income. The income generated during the time the Trust Assets were invested in the Placentia Property consisted of the rental income of approximately $200,000-$300,000. This was the amount of money Mrs. Grahek-Atkinson had received prior to the sale of the Placentia Property and it was reasonable for the Trustee maintain a similar distribution scheme for Mrs. Grahek-Atkinson during the period of time they were seeking a 1033 property and managing the proceeds of the Placentia Property sale. Trustees also had a duty to the residual beneficiaries of the Trust. The residual beneficiaries would obtain the principal upon the death of Mrs. Grahek-Atkinson. Trustees had a duty to preserve and grow this principal for the residual beneficiaries.

The second factor of great significance is the gift of hindsight. Hindsight is not only an independent issue but it interplays with the Trust serving two masters. The stock market unexpectedly fell significantly in 2008. Seeing this dramatic decrease in value play out with the assets of the Trust make Objectors quickly jump to the conclusion that the Trustees failed to keep the assets safe. With hindsight, they identify what they believe should have been done with the assets. But their assertions fail to give appropriate weight to the necessity to provide income to Mrs. Grahek-Atkinson. Objectors would have you believe that all assets should have been kept in cash and that if Mrs. Grahek-Atkinson needed more funds than the income generated by holding money in cash or cash equivalent, principal could have been invaded to provide for her

14

needs. However, invasion of the principal would have been detrimental to the residual beneficiaries and a breach of the Trustee's fiduciary duty to them.

The Court finds that the Trustee fulfilled its fiduciary duty to the Trusts from the time the Placentia Property was sold until the Trustees Pro Tem took over administration of the Trusts[4]. A review of the choices made by the Trustee and the testimony of their employees demonstrates that the Trustee complied with the Prudent Investor Rule.

At the time the Placentia Property was sold, Trustee intended to complete a 1033 exchange. Until an appropriate property could be obtained, Trustee was given the responsibility to manage the $8.7 million proceeds from the sale of the property. Employees of Trustee testified that the funds had to generate income to provide for Mrs. Grahek-Atkinson and grow principal for the benefit of the residual beneficiaries. Furthermore, the Trustee created a contingency plan should an appropriate property not be secured. The contingency plan was to set-aside the amount of capital gains taxes that would be due as a result of the sale of the Placentia Property. This set-aside served as the contingency plan throughout the Trustee's administration following the sale of the Placentia Property.

Trustee's employees testified that they initially intended to seek non-recourse financing so that when a replacement property was found, some of the funds from the Trust could be used in conjunction with the non-recourse financing while allowing the remaining funds from the Trust to be held in investments. This plan would essentially create a source of rental income for the income beneficiary along with the growth of principal for the benefit of the residual

_____

[4]While the account filed by Trustee spans a greater time period than that between the sale of Placentia and the appointment of the Trustees Pro Tem, this period of Administration is the crux of the litigation.

15

beneficiaries[5]. The percentage of Trust funds to be used in the purchase of a replacement property were subject to alteration through the 1033 process with the Trustee. Initially, Mr. George sought to utilize non-recourse financing to cover approximately 80% of the purchase cost of the replacement property, only intending to utilize the $2 million placed in reserve for taxes as the cash contribution from the trust. N.T. p. 258, ll. 8-14. However, in an e-mail dated June 18, 2007, the real estate department discussed that the property to be purchased under the 1033 Exchange could not be leveraged at 80%. Mr. Bernett testified that the Bank's committee in charge of determining whether to purchase a property would not approve borrowing more than 50% of the purchase price. N.T. p. 379 l. 5 - p 381, l. 15.

The Court finds the testimony of Mr. Mark Allen to be extremely persuasive. Mr. Allen testified about the investment goals for Trustee in light of the 1033 exchange. Specifically, the goal was to invest the proceeds of the Placentia Property so that the Trusts would maintain buying power in the real estate market. In order to provide income to Mrs. Grahek-Atkinson and maintain buying power in the real estate market, Trustee made the reasonable and sound decision to set aside the amount owed to cover potential capital gains taxes and invested the rest of the funds in the market utilizing the balanced portfolio theory. The choice to place approximately $2 million into cash or cash equivalents by Trustee was a contingency plan if an acceptable 1033 exchange property could not be vetted and purchased. Meanwhile, the remaining funds were able to generate sufficient income to provide a source of revenue for Mrs. Grahek-Atkinson.

Trustee has complied with the provisions of 20 Pa.C.S. §7203 (c) of the Prudent Investor

---

[5]Eventually, the Trusts would hold title to a replacement property and have a significant amount of investments that could be liquidated if necessary. This would also result in the diversification of the assets held in the Trusts.

16

Rule. Trustee established a primary goal of completing a 1033 exchange to minimize the tax consequences of the sale of the Placentia Property. The Trustee created a fund to pay the taxes if an appropriate property could not be found. Finally, the Trustee invested the funds not set aside for taxes in a manner in which they could (a) provide income for Mrs. Grahek-Atkinson similar to the amount she received in rental income from the Placentia Property, (b) grow the principal so that they fulfilled their obligation to the residual beneficiaries; (c) invest the funds in a manner in which the growth could keep apace of the booming real estate market to ensure buying power; and (d) provide an investment sound strategy (utilizing the balanced portfolio theory) to continue to grow the assets if a 1033 exchange could not be accomplished.

Trustee considered their fiscal responsibility to the income beneficiary as well as the residual beneficiaries. Trustee demonstrated a commitment to completing a 1033 exchange. However, Trustee also considered the ramifications of not completing a 1033 exchange and developed a contingent plan.

Objectors make much of the fact that the window of opportunity to complete a 1033 exchange was coming to a close and Trustee had not secured a property. What would have happened if Wells Fargo had remained Trustee is purely speculative and completely irrelevant to the argument of both sides. However, by agreement, Trustee was replaced and not one, but two properties were purchased by the 1033 exchange deadline. The choice of properties and financing rested solely with Trustees Pro Tem. Trustees Pro Tem were able to buy two properties worth more than the Placentia Property, were able to secure non-recourse financing and avoided capital gains taxes.

Furthermore, it is apparent that hindsight guides the argument of Objectors. Initially, the

17

goal of Trustee had been to utilize the $2 million set aside for capital gains taxes as a cash contribution to the purchase of a replacement property. Even the Trustee's amended position of only using non-recourse financing for 50% of the purchase price of the property still would have resulted in a significant increase in value to this trust. Essentially the Trustees intended to purchase a property worth $8.7 million or more. Assuming a property purchased for $8.7 million, the Trust would utilize $4.35 million to purchase the property. This would leave $4.35 million to invest in either more real estate or in a balanced portfolio. The Trustee's parameters for an appropriate property included a revenue source. The property would pay its own mortgage and possibly even create a revenue source (if the rental payments exceeded the cost of paying the financing). Once the payoff of the non-recourse financing was complete, the Trust would hold a property worth approximately $8.7 million as well as maintaining an investment portfolio with the remaining $4.35 million not used in the 1033 exchange, excluding any gains realized during this time period and without ever paying capital gains on the sale of the Placentia Property. This plan was extremely lucrative and obviously appealing to the Objectors who were readily in agreement at the start of the process.

During the time in question, Wells Fargo was serving as Trustee of Trust A and Trust B. The Trust provisions did not require the Trust seek the input or approval of the beneficiaries to make any decisions. Such inclusion appears to have been done as a courtesy to long-standing clients. The Objectors started the 1033 exchange process with the expectation that they would see returns outlined above.

However, due to the sudden and unexpected collapse of the stock market in 2008, these anticipated returns did not come to fruition during the Trustee's term. Objectors, in hindsight

18

and only after the catastrophic decline in the financial markets in 2008, sought to find a failure in the investment strategy developed by Trustee. The sudden historic decline in the stock market and not the actions of the Trustee, resulted in the loss in portfolio value of these trusts. The fact that the market Collapsed with the resulting decline in the portfolio values in the Trusts, does not establish that the Trustee breached its fiduciary duty to Mrs. Grahek-Atkinson or to the residual beneficiaries. Based upon the totality of the record, the Objectors failed to meet their burden of proof that the Trustee breached its fiduciary responsibilities. They failed to establish that the Trustee should be surcharged for its investment policies and decisions in the handling of the Trusts.

For the reasons set forth above, the Court finds that the Trustee fulfilled its fiduciary duty and acted in accordance with the Prudent Investor Rule.

**Objection 5 and Objection 6**

Objection 5 asserts that the Trustee failed to sell certain listed securities (listed as "a" through and including "j" for Trust A and "a" through and including "h" for Trust B) by the end of calendar year of 2007. Objectors assert that selling these securities would have resulted in "locking in" significant capital losses which could have offset the capital gains for the tax return of 2007. Objection 5 ties in significantly with Objection 6 which then objects to the tax liabilities created by the purported failure to use the sale of the securities listed in Objection 5 to minimize the capital gains due on value earned by the investments in 2007.

Objectors objections focus in on one calendar year in which the Trustee purported to fail to take a loss for tax purposes. However, the actions or inactions of a Trustee cannot be carved out and looked at in a vacuum. Objectors urge the Court to look only at the 2007 year. Trustee,

19

in portions of their supporting brief, urge the Court to look at the period of growth of the Trusts from inception to current day. Trustees seek the overly broad while the Objectors seek the narrowly constricted. The Court is persuaded by neither.

Trustees served for decades. It is the duty of the Trustee to weigh the benefits of all actions it undertakes on behalf of its clients, to whom a fiduciary duty is owed. Yet to treat each calendar year as a strict unit of measuring the choices of a trustee would fail to truly, adequately or appropriately measure the choices of the fiduciary.

As testified to by Mr. Allen, who served as the trust investment officer for the Trusts, the Trustee did not "lock in" capital losses in 2007. In the instant action, the Trustee did then lock in losses in 2008. Mr. Allen testified that although he could not remember why he did not take the capital gains losses in 2007, there were reasons why you would not always take capital gains losses in a portfolio. However, Mr. Allen testified that he did make a trade in 2008 to take care of some of the capital gains in the Grahek portfolio.

Objectors have failed to demonstrate that the Trustee's decision to not "lock in" capital losses was a breach of fiduciary duty. Trust administration of investments under a balanced portfolio scheme cannot be sequestered by year. Each year's investments roll into the following year with the gains or losses following such investments. Furthermore, Objectors have failed to demonstrate through clear and convincing evidence as presented at the time of the hearings that they suffered a loss beyond what was re-captured in 2008. For these reasons, the Court dismisses Objection 5 and 6.

**Objection 2**

Objectors second Objection is to the request in the Petition for Adjudication for a reserve

20

of $7,500.00 for each trust. Specifically, Objection 2 states, in part:

> . . . . Objectants strongly oppose the establishment of this reserve, in that Petitioner seeks only to protect itself from liability sought to be imposed by Objectants for harm the latter alleges it has suffered as a result of Petitioner's failure to carry out its fiduciary duties. Permitting such a reserve does not and cannot inure to the best interest of the trust, nor its beneficiaries, and in the circumstances is suggestive of waste and mismanagement. Objectant submits that such a reserve is patently inappropriate in the circumstances.

For reasons set forth more fully above, the Trustee was found to have not breached any fiduciary duty.

To "reserve", as defined by Black's Law Dictionary, means "[t]o keep back, to retain, to keep in store for future or special use, and to retain or hold over to a future time." 4th Edition. Trustee requested a retainer of $7,500.00 in each trust to put towards potential future expenses associated with litigation surrounding the filing of their Accounts. Trustee has been found, as discussed at great length above, to have acted appropriately regarding the management of the Trusts at issue. Furthermore, the request of a reserve of $7,5000.00 in each trust is slight when taking into consideration the portfolio value of the Trusts, and the complexity and years of litigation.

The Court finds that the request of a reserve of $7,500.00 in each trust is appropriate given that Trustee carried out its fiduciary duties[6].

**Objection 3**

---

[6]Upon the entry of this Opinion, it is foreseeable that Trustee will file a subsequent Petition for the payment of their costs and attorney fees associated with defending their actions as Trustee. Obviously, the $7,500.00 requested reserve could be credited towards the payment of that bill. However, as of the time of the hearing, Trustees had not submitted any Additional Credits to be reflected on the Adjudication of their Account and thus the $7,500.00 remains intact as a reserve in each trust.

21

Objectors third Objection raises concerns about Trustee's decision to seek not one but two legal opinions with regards to the 1033 exchange. Objectors believed that seeking these opinions was redundant especially in light of the fact that a draft opinion had been formulated by an Attorney prior to the two opinions in question. Specifically, Objectors Objection under Trust "B" is:

> 3. Objection is made to the Petitioner's procurement of two (2) separate opinions with regard to the elements and time constraints of a 1033 transaction as well as a nearly complete third opinion. The subject opinions address the same issues and represent a wasteful redundancy in the circumstances. Objection is made to legal fees paid as a Disbursement of Principal to Stephen J. Schumacher for the nearly complete opinion on or about 8/15/05. The amount of the payment is believed to be $4,283.27[7]. Objection is made to legal fees paid as a Disbursement of Principal to Howser & Brown for one (1) of the subject opinions on or about 10/16/08. The amount of the payment is believed to be $3,734.18[8]. Further objection is made to legal fees paid to Hartman Underhill and Brubaker, also comprising a Disbursement of Principal, occurring on or about 12/29/06, the amount of which Objectant believes may be $2,941.00[9] but about which amount Objectant is uncertain and requests clarification of the amounts actually paid for each of the subject opinions.

In 2005, well before the sale of the Placentia Property, Trustee was provided a draft letter opinion from Attorney Schumacher, an attorney licensed in California. In fact, the testimony presented and Objectors admit in their reply brief that the opinion of Attorney Schumacher was initially requested by outside counsel, Attorney Gerald Williams, who had also worked for the

---

[7]The Amount of $4,283.27 is reflected in the Amended Objections to Trust "B" while the amount of $1,366.73 is reflected in the Amended Objections to Trust "A'.

[8]The amount of $3,734.18 is reflected in the Amended Objections to Trust "B" while the amount of $1,145.82 is reflected in the Amended Objections to Trust "A".

[9]The amount of $2,941.00 is reflected in the Amended Objections to Trust "B" while the amount of $1,883.79 is reflected in the Amended Objections to Trust "A".

22

Grahek family in California. Objectors Reply Brief, p. 59; N.T. p.157, l. 23- p. 158, l.9. This opinion letter was never finalized and specifically stated that it was not to be relied upon. See Exhibit G-301.

In 2006, David Grahek raised concerns about the timing of the completion of the 1033 exchange in light of his mother's increasing age. N.T. p. 157, ll. 2-5. As a direct result of the concerns of Mr. Grahek, Trustee sought to obtain another legal opinion. The testimony presented by Trustee demonstrated that the Hartman Underhill and Brubaker Opinion of Attorney Tom Bergan was sought to specifically address this issue raised by Mr. David Grahek. Furthermore, Mr. George testified that the Attorney Schumacher draft opinion was considered prior to obtaining the opinion of Attorney Bergan but that Attorney Bergan's Opinion was ultimately sought. N.T. p. 157, ll. 9 - 18. Attorney Bergan's inclusion of summary information of the nature of a 1033 exchange is cursory and to be expected. See Exhibit G-45.

Subsequent to the Bergan Opinion, Trustee sought another legal opinion. While the Opinion from Howser & Brown did relate to the 1033 exchange in general for purposes of background information, the specific legal issue sought to be addressed was whether the trusts could purchase property via a pass-through entity. See Exhibit WF- 260.

Trustee demonstrated, through the testimony of their employees, that the two subsequent opinions sought from Hartman Underhill & Brubaker then Howser & Brown were for different issues related to the 1033 exchange. Much has been made about the familiarity or lack of familiarity of Trustee with a 1033 exchange. However, the unique nature of a 1033 Exchange was exemplified to the Court through the revelation that neither, Ms. Spencer nor Mr. Maloney, both experts called for the respective sides, had ever completed a 1033 Exchange through their

23

normal course of business. N.T. p. 576, l. 17- p. 577, l. 12.

Objectors brash accusation that the Trustee demonstrated "reckless indifference" in obtaining legal opinions is patently absurd. Pg. 61 Reply Brief of Objectors. Ms. Spencer has never completed a 1033 Exchange. Mr. Maloney has never been involved with a 1033 exchange. Yet through their education and research, they were both able to understand the 1033 exchange process and their respective testimony confirmed this. The entire purpose of a legal opinion is to be able to advise a client of the ramifications of choices made in the 1033 Exchange process. In order to make informed, prudent decisions, the Trustee had to arm themselves with the requisite knowledge. This was done through the legal opinions sought from reputable attorneys.

The Court finds that it was prudent of the Trustee to obtain the legal opinions from Hartman, Underhill & Brubaker. Specific concerns related to Mrs. Grahek-Atkinson's advanced age could have significant ramifications on the Trustee's plan to complete a 1033 Exchange. David Grahek raised these concerns approximately one (1) month after the sale of the Placentia Property. The information and legal opinion obtained was pertinent, necessary and perhaps most importantly, timely. Trustee demonstrated sound judgment in obtaining the Hartman, Underhill & Brubaker Opinion and was well within their discretion.

Furthermore, as time passed and new legal issues were brought to the forefront of concerns, Trustee prudently obtained another legal opinion from Howser & Brown. The Howser & Brown opinion was dated September 15, 2008. Objectors acquiesced that the following topics of the Howser & Brown opinion were not covered by prior opinions: the ability to finance the purchase of the replacement property; the concept of creating an LLC to purchase a replacement property in the 1033 Exchange; the computation of the tax basis of the replacement property; and

24

recapture of depreciation of the Placentia Property. See Objectors Brief, pg 69-70. It is plain to see the importance of understanding the issues briefed by Howser & Brown which were not addressed in prior opinions. The titling and tax basis of the replacement property were of utmost significance to the residual beneficiaries. As discussed before, the Trustee had two obligations, to provide income for Mrs. Grahek-Atkinson, and a responsibility to the remainder beneficiaries. A computation of tax basis of the replacement property has long-term and significant repercussions.

Objectors also opine that it was a breach of trust for the Trustee to have not gone back to Attorney Schumacher to have him complete his opinion rather than seeking new opinions. This argument is not persuasive. There is no evidence that the Trustee acted with reckless indifference or reckless disregard in obtaining multiple opinions on a variety of different legal issues. Furthermore, the Trustees had no experience with Attorney Schumacher prior to his penning the draft opinion. N.T. p. 157, ll. 9 -15. It was reasonable for Trustees to seek legal opinions and it was within its discretion to seek as well as pay for the Opinions of Attorney Schumacher, Hartman Underhill & Brubaker as well as Howser & Brown.

**Objection 7**

Objection 7 was withdrawn by Objectors in their Brief in Support of Objections as it was testified to that the Trustee did not charge an additional fee beyond the Trustee fee to prepare the fiduciary income tax returns.

**Objection 1 and 8**

Objectors objections 1 and 8 are similar and will also be addressed together by the Court. Objectors initially object to the fees and commissions taken by Trustee. Specifically Objector's

25

Objection 1 states:

> [The Trust Document] suggests that Wells Fargo is entitled to be compensated in accordance with the Direct Agent Fee Schedule. Objectants request a copy of the calculation of that fee. Wells Fargo is represented also to have taken principal commissions of $3,600 on Trust A since March 2009 [and $9,620.00 on Trust B since March 2009], which Objectants are unable to follow in the Account. In any event, both the fees and commissions referred to in Rider B are objected to on the basis that Petitioner did not carry out its fiduciary duties and engaged in breaches of trust during the administration. Though Rider B does allude to a trustee's ability to resign". . . with court approval. . .," Petitioner has consistently maintained that it would not resign without a full release from liability, executed by all of the beneficiaries of the trust.

Objectors brief asserts that the Trustee charged $6060 in fiduciary fees in addition to principal commissions of $3,600 in Trust A and $9,620 in Trust B. Objectors asserted that the Trustee's failure to provide a detailed accounting of the fees charged results in an lack of transparency in billing and this, coupled with the "fundamental and egregious breaches of trust committed by the Bank" should result in the Trustee not being entitled to the fees.

Objectors final objection relates to all fees and commissions collected by the Trustee in its fiduciary capacity. Objectors assert that Trustee is not entitled to any fees as a result of their purported breach of fiduciary duty. Specifically, Objection 8 is as follows:

> 8.  Objection is made to the fiduciary fees, commissions on principal, fees and commission on Petitioner's proprietary Evergreen and other funds, tax service fees, commissions on income, sweep fees, Trustee Account Fees and all related and associated fees set forth in the Account for Trust A, and to the extent apposite, set forth in the Account for Trust B, charged by Petitioner in the context of trust administration, due to the failure of Petitioner to carry out its fiduciary duties and due further to the breaches of trust by Petitioner.

As discussed in great length above, the Court finds that the Trustees breached no fiduciary duty and complied with the Prudent Investor Rule. Objection 1 and Objection 8 both start from a conclusion that Trustees breached a fiduciary duty and for that reason they are not

26

entitled to fees. The Court reads these Objections as being based solely on the breach of fiduciary duty and in no way do they reflect an objection to the amount charged[10]. The Objections do not call for a reduction in fees but essentially state that because of the breach of fiduciary duty, there is no entitlement to any fees.

The Trustee fulfilled its due diligence and there was no breach of fiduciary duty. Therefore, the basis for Objection 1 and 8 have not been established and the fees are allowed. The fees are reflected in the account and the account is accepted as filed.

Assuming *arguendo* that Objection 1 and 8 must be scrutinized further, the objections of Objectors still fail to meet their burden of proof.

Objection 1 is essentially a discovery request that was, apparently, never followed up on by Objectors. Objectors are quick to point out that the Account of Trustee did not provide "detailed, monthly statements disclosing Trust value." Objectors Brief, pg. 65. But during the period in question, Trustees Pro Tem, who are also two of the Objectors, were serving as trustees and were fiscally responsible for the assets in the Trust. Their assertion that Trustee, who was no longer serving as a trustee, is solely responsible for providing value of the Trusts assets is incredulous.

Furthermore, the Settlement Agreement, which was made an Order of Court, clearly identified the fees that Trustee could continue to charge after Trustees Pro Tem took over the administration of the Trusts. Objectors, only in their Responsive Brief, acknowledge that in the

---

[10]Furthermore, Objection 8 does not even identify an amount at issue and, as such, supports the Court's determination that these objections are based solely upon the alleged breach of fiduciary duty. If the Trustees had breached their duty, then, as Objectors seem to assert, their entitlement to any fees would be appropriate.

27

Settlement Agreement, they agreed to pay fees but still raises, essentially, a discovery issue.

In consideration of the Settlement Agreement and the lack of testimony presented by Objectors on this issue, the Court finds that the Account as submitted coupled with the Settlement Agreement provides sufficient evidence that the fees charged and reflected in the Account are reasonable. An analysis of the factors of La Rocca, which expands the factors analyzed in determining the reasonableness of fees first established by the fee schedule of Johnson Estate, 4 FIDUC. REP. 2d 6 bolsters this finding. La Rocca's Trust Estate, 431 Pa. 542, 246 A.2d 337 (1968).

For the reasons set forth above, the Court denies Objectors Objection 1 and 8. Adjudications for the Trusts shall be entered by separate Order.[11]

---

[11]While the Court enters this Adjudication on the First and Final Account filed by Trustee on January 14, 2011 and supplemented by a Memorandum for Audit for each Trust filed on March 1, 2011, the Court anticipates that a subsequent Petition by Trustee for Court Approval of Legal Fees associated with the defense of their actions while Trustee may be filed and will need to be addressed.

28